# IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

| | |
|---|---|
| Joseph Stanton<br>Richard Stanton<br>Plaintiff s<br><br>v.<br><br>TaaSera, Inc.<br>Defendants | Civil<br>Case No.: 444457V |

## DEFENDANT TAASERA, INC.'S
## MOTION TO DISMISS FOR LACK OF IN-PERSONAM JURISDICTION
### and
## MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

COMES NOW Defendant Taasera, Inc., by and through Counsel, Stephen A. Shechtel, Esq., and the law offices of Shechtel and Shechtel, P.A. and in accordance with Rule CP 2-322, and it files this MOTION TO DISMISS, and in support of the same, Defendant TaaSera, Inc., represents as follows:

1.	Plaintiffs herein filed a one count lawsuit against Defendant for violation of Maryland's Wage payment and Collection Act. (Md Code Ann. Lab & Empl. §3-501 et. seq.).

2.	Defendant TaaSera, Inc., is a Delaware Corporation[1].

3.	At the time Plaintiffs became associated with Defendant TaaSera, Inc., Defendant TaaSera, Inc.'s principal offices were located in Erie, PA.

4.	As of the date of this Motion, Defendant TaaSera, Inc.'s principal offices are located in Salt Lake City, UT.

5.	Defendant TaaSera, Inc., applied for and terminated its right to do business in Maryland as a foreign corporation on April 3, 2013[2].

---

[1]	Copy of State of Delaware Department of State: Corporations, record of corporate status: Exhibit 1.  Plaintiffs in their complaint (incorrectly) aver that Defendant TaaSera, Inc., is a Pennsylvania corporation.

[2]	Copy of Application for Termination for a Foreign Corporation Qualification, Exhibit 2, filed with SDAT.

6.      In its Application for Termination for a Foreign Corporation, Defendant TaaSera, Inc., affirmed to the Maryland Department of Assessments and Taxation was accepted on April 3, 2012 and of record on April 5, 2012.

7.      Defendant TaaSera, Inc., does not contract for business within the State of Maryland.

8.      Defendant TaaSera, Inc., does not pay taxes in the State of Maryland.

9.      Defendant TaaSera, Inc., does not contract to supply services or goods within the State of Maryland.

10.      This case does not arise from an action or inaction that occurred within the State of Maryland.

11.      Defendant TaaSera, Inc., does not derive income or revenue from the State of Maryland.

12.      Defendant TaaSera, Inc., does not own or lease realty in the State of Maryland.

13.      At all times relative hereto, Defendant TaaSera, Inc., did not, nor did it ever maintain a business, sales, or other offices within the State of Maryland.

14.      Defendant TaaSera, Inc.'s, last business office in the Washington Metro area was located at: Make Offices, 1751 Pinnacle Dr #600, McLean, VA 22102[3].

15.      Defendant TaaSera, Inc.,  closed its office at 1751 Pinnacle Dr #600, McLean, VA 22102 in February 2016.

16.      Defendant TaaSera, Inc., does not own personal property in the State of Maryland.

17.      Defendant TaaSera, Inc., does not advertise for business in the State of Maryland.

18.      Defendant TaaSera, Inc., does not transport anything in or out of the State of Maryland.

19.      Defendant TaaSera, Inc., does not direct any products into the stream of commerce to or from the State of Maryland.

---

[3]      Make Offices (previously Uber Offices) offers month to month shared (temporary) offices to its tenants.  Make Offices advertises that it offers: turnkey, move-in ready, furnished work spaces with office infrastructure you need (Free Parking, fast WiFi, conference rooms, 24/7 access, private call rooms, unlimited printing/copying/scanning).

20.    Defendant TaaSera, Inc., has not, is not, and does not plan upon, doing business in the State of Maryland.

21.    This case does not arise from any act detailed in Md Code Ann. CJP Title 6 Subtitles 103.1 through 104.

22.    Defendant TaaSera is not a "person" domiciled within the State of MD as defined by Md Code Ann. CJP §6-102.

23.    This case does not arise from any act detailed in Md Code Ann. CJP Title 3.

24.    This case does not arise from any act involving:

a.    medical care or treatments to an Maryland resident;

b.    An insurance claim;

c.    A tort action;

d.    A tortuous injury;

e.    Any intentional act;

f.    An agreement for the solicitation of orders within the State of Maryland; or,

g.    Realty, owed, leased, or used within the State of Maryland.

25.    At no time has TaaSera, Inc., consented to the jurisdiction of the Maryland Courts.

26.    All financial records arising from the transactions that are the subject of the instant litigation are located outside of the State of Maryland.

27.    All banking records arising from the transactions that are the subject of the instant litigation are located outside of the State of Maryland.

28.    Each and every communication, contact, and the like involving the parties dealings occurred in States other than Maryland.

29.    This suit does not arise from:

a.    a contract made in Maryland;

b.    a contract where performance occurred within Maryland;

c.    a contract that was breached in Maryland;

d.    a Defendant situated within Maryland.

30.    There is no basis pursuant to Maryland Chapt. 2-307 et. seq. for this Court to exercise jurisdiction over the non-resident Defendant TaaSera, Inc.

31.    The alleged contract upon which this suit arises did not provide for jurisdiction to be grounded within the State of Maryland.

32.    This MOTION TO DISMISS is supported by the attached Memorandum of Points and Authorities.

33.    This MOTION TO DISMISS is supported by the attached AFFIDAVIT of Eric Hale, Chief Executive Officer of Defendant TaaSera, Inc.

34.    Defendant TaaSera, Inc. has incurred attorneys fees and costs in the preparation and filing of this Motion.

*Facts specifically related to Richard P. Stanton*

35.    On or about August 3, 2012, Defendant Richard P. Stanton entered into a Consulting Agreement with Defendant TaaSera, Inc.[4]

36.    In an undated contract in December 12, 2012, Defendant Richard P. Stanton entered into an Employment Agreement with Defendant TaaSera, Inc[5].

37.    At all times relative hereto, Defendant Richard P. Stanton's Employment Contract provided, inter alia, that:

13.    Consequence of Termination of Employment or Change of Control.
(d) Dispute Resolution for Compensation Rewards Following Termination of Employment
In the event a dispute arises between Employee and Company with respect to whether any Compensation Rewards are payable to Employee following termination of Employee's employment, Employee shall notify the chief executive officer of Company in a writing (the "Dispute Notice") of such dispute within 30 days after Employee obtains knowledge of the amount of the Compensation Rewards (if any), being paid by Company to Employee.... The Dispute Notice shall identify the Compensation Rewards that are in dispute and shall describe in reasonable detail the position of Employee with respect thereto.

19.    Governing Law; Construction of Agreement.
This Agreement shall be governed by the laws of the Commonwealth of Pennsylvania without regard to any conflicts of laws provisions. This Agreement is the joint product of Employee and Company and each provision hereof has been subject to the mutual consultation, negotiation and agreement of Company and Employee, who was represented

---

4       Exhibit 3.

5       Exhibit 4.

by counsel, and shall not be construed for or against any party hereto on the basis of any party that has acted as draftsperson.

22. Arbitration; Waiver of Jury Trial.
(a) Any dispute or controversy arising under, out of, in connection with or in relation to this Agreement may, at the election and upon written demand of either Employee or Company and the consent of the other, be finally determined and settled by arbitration before a panel of three arbitrators to be held in Pittsburgh, Pennsylvania in accordance with the rules and procedures of the American Arbitration Association...

38.    At no time during the parties relationship did Plaintiff Richard P. Stanton serve upon Defendant TaaSera, Inc., a "Dispute Notice."

39.    In the instant action, Plaintiff Richard P. Stanton avers that Defendant TaaSera, Inc., failed to pay him wages and that he is entitled to relief pursuant to Maryland's Wage payment and Collection Act. (Md Code Ann. Lab & Empl. §3-501 et. seq.).

40.    According to his Contract, Plaintiff Richard P. Stanton must look to Pennsylvania law for relief.

41.    According to Plaintiff Richard P. Stanton's written contract with Defendant TaaSera, Inc., all of the rights and obligations of the parties are to be governed by Pennsylvania law.

42.    At no time did the alleged contract upon which Plaintiff Richard P. Stanton relies touch or concern the State of Maryland.

43.    At no time during the parties relationship did Plaintiff Richard P. Stanton's Contract provide for the application of Maryland law.

44.    At no time during the parties relationship did Plaintiff Richard P. Stanton make a written demand upon Defendant TaaSera, Inc., for Arbitration.

45.    Based upon the provisions of Plaintiff Richard P. Stanton's Employment Agreement, Maryland, the provisions of Maryland's Wage payment and Collection Act. (Md Code Ann. Lab & Empl. §3-501 et. seq.) are inapplicable here.

46.    Plaintiff Richard P. Stanton has failed to state a claim upon which this Court is able to grant him the relief prayed for under his Employment Contract.

47.    For all of the above reasons, the Complaint of Richard P. Stanton must be dismissed.

*Facts specifically related to Joseph M. Stanton*

48.    On or about February 6, 2014, Joseph M. Stanton was offered employment at TaaSera, Inc.[6]

49.    Following his acceptance of the February 6, 2014 offer, TaaSera, Inc., delivered to Joseph M. Stanton an employment contract.

50.    The form of the Employment Contract executed by Joseph M. Stanton was the same contract executed by Plaintiff Richard Stanton, with the only differences being: compensation, date(s) of employment, and the name "Joseph" was substituted for "Richard."

51.    The employment contract was known to have been executed by Joseph M. Stanton.

52.    A copy of the employment contract executed by Joseph M. Stanton, as of this Motion, cannot be located.

53.    CEO Eric Hale affirms in his Affidavit that the employment contract executed by Joseph M. Stanton was exactly the similar to the contract executed by his brother, Richard Stanton with the only difference being compensation.

54.    At no time during the parties relationship did Plaintiff Joseph M. Stanton serve upon Defendant TaaSera, Inc., a "Dispute Notice."

55.    In the instant action, Plaintiff Joseph M. Stanton avers that Defendant TaaSera, Inc., failed to pay him wages and that he is entitled to relief pursuant to Maryland's Wage payment and Collection Act. (Md Code Ann. Lab & Empl. §3-501 et. seq.).

56.    According to his Contract, Plaintiff Joseph M. Stanton must look to Pennsylvania law for relief.

57.    According to Plaintiff Joseph P. Stanton's written contract with Defendant TaaSera, Inc., all of the rights and obligations of the parties are to be governed by Pennsylvania law.

58.    At no time did the alleged contract upon which Plaintiff Joseph M. Stanton relies touch or concern the State of Maryland.

59.    At no time during the parties relationship did Plaintiff Joseph M. Stanton's Contract

---

[6]    Exhibit 5.

provide for the application of Maryland law.

60.     At no time during the parties relationship did Plaintiff Joseph M. Stanton make a written demand upon Defendant TaaSera, Inc., for Arbitration.

61.     Based upon the provisions of Plaintiff Joseph M. Stanton's Consulting Agreement, Maryland, the provisions of Maryland's Wage payment and Collection Act. (Md Code Ann. Lab & Empl. §3-501 et. seq.) are inapplicable here.

62.     Plaintiff Joseph M. Stanton has failed to state a claim upon which this Court is able to grant him the relief prayed for under his Consulting Contract.

63.     For all of the above reasons, the Complaint of Joseph M. Stanton must be dismissed.

64.     Defendant TaaSera incurred attorney's fees and costs to defend this matter.

WHEREFORE, the premises considered, this lawsuit must be dismissed for a lack of in personam jurisdiction upon the non-resident Defendant TaaSera, Inc., and for the Plaintiff's failure to state a claim upon which relief may be granted by this Court, for its attorneys fees and costs incurred herein, and for and such other and further relief that this Court deems proper and just.

Respectfully,

Stephen A. Shechtel, Esq.
Shechtel and Shechtel, P.A.
17 W. Jefferson Street Suite 205
Rockville, Md 20850
telephone:    301-309-1440
stephen@shechtel.com
Circuit Court for Montgomery County        #14535


REQUEST FOR ORAL ARGUMENT/HEARING
Defendant TaaSera, Inc., requests oral argument on this matter/motion in accordance with Rule 2-311(f).

## CERTIFICATE OF SERVICE

I, <u>Stephen A. Shechtel,</u> certify on this date, May 18 2018, that I caused to be delivered via:

[x ]   U.S. Mail, First Class, postage prepaid to the address indicated below; or,
[ ]    hand delivery

a copy of the aforegoing CERTIFICATE OF SERVICE and MOTION TO DISMISS FOR LACK OF IN-PERSONAM JURISDICTION and FAILURE TO STATE A CLAIM with attachments, affidavits, memorandum of law, and exhibits (if any) to:

Neil S. Hyman, Esq.
4520 East West Highway 700
Bethesda, MD 20814

Stephen A. Shechtel, Esq.

C:\Users\SShechtel\Documents\WP51\ss-esq\CVL-PRO\_PRELIMINARY MOTIONS & SERVICE\DISMISSAL & VENUE\DISMISS CASE\JURIS\Tassera No Juris Stantons FINAL.wpd

# AFFIDAVIT

I, <u>Eric Hale</u> on this May _____ 16 _____ , 2018 do hereby make this AFFIDAVIT before a Notary Public, under oath, and I do hereby say as follows:

 1. That I am over the age of eighteen and am competent to testify in a court of law.

 2. That I am the same Eric Hale who is the Chief Executive Officer for Defendant TaaSera, Inc., the named Defendant herein.

 3. That I have read the Motion to Dismiss, and the Memorandum in support of the Motion to Dismiss, and the facts contained therein are true and correct.

 4. That all Exhibits attached to the Motion to Dismiss are true copies of the originals.

 5. That at no time was I served with a "Dispute Notice" by either Plaintiff.

 6. That since my association with TaaSera, it has not done business in Maryland.

 7. That I am aware that an employment contract was executed by Joseph M. Stanton with TaaSera, however, due as of the date of my Affidavit, we have not been able to locate a copy of the employment contract executed by Joseph M. Stanton.

 I solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of the foregoing paper are true.

_____

   Eric Hale, CEO, TaaSera, Inc.

STATE OF _Utah_       ) ss

COUNTY OF _Salt Lake_    )


I HEREBY CERTIFY that on this _16th_ day of May 2018 before me the Subscriber, a Notary Public in and for the State and County aforesaid, personally appeared Eric Hale who is personally known to me (or proven) to be the person who executed the within AFFIDAVIT and acknowledged the same to be the act and deed, of TaaSera, Inc., and further that his signature was duly authorized by the Board of Directors, and he did depose and say the above affidavit was true and correct to the best of his/her knowledge and information.

WITNESS MY HAND AND NOTARIAL SEAL.


_Notary Public_

My Commission Expires: _8/10/2020_

NOTARY PUBLIC
GILBERTO IZARRARAZ FERNANDEZ
Commission No. 690642
Commission Expires
AUGUST 10, 2020
STATE OF UTAH

STATE OF _Utah_ ) ss

COUNTY OF _Salt Lake_ )

I HEREBY CERTIFY that on this _16th_ day of May 2018 before me the Subscriber, a Notary Public in and for the State and County aforesaid, personally appeared Eric Hale who is personally known to me (or proven) to be the person who executed the within AFFIDAVIT and acknowledged the same to be the act and deed, of TaaSera, Inc., and further that his signature was duly authorized by the Board of Directors, and he did depose and say the above affidavit was true and correct to the best of his/her knowledge and information.

WITNESS MY HAND AND NOTARIAL SEAL.

_Notary Public_

My Commission Expires: _8/10/2020_

NOTARY PUBLIC
GILBERTO IZARRARAZ FERNANDEZ
Commission No. 690642
Commission Expires
AUGUST 10, 2020
STATE OF UTAH

# IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

Joseph Stanton
Richard Stanton
    Plaintiff s

      v.

TaaSera, Inc.
175 S. Main Street 500
    Defendants

Civil
Case No.: 444457V

## ORDER TO DISMISS CASE FOR LACK OF IN PERSONAM JURISDICTION
### and for
## FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED

Upon a review of Defendant TaaSera, Inc.'s Motion to Dismiss, and any Opposition thereto, it is by this Court, on this _____ day of _____ 2018 hereby found as follows:

### FINDINGS

Defendant TaaSera, Inc., is a Delaware Corporation whose principal offices are in Salt Lake City, UT. Defendant TaaSera, Inc., at all times relative to this case did not conduct business in the State of Maryland, did not advertise to direct any business into the stream of commerce into the State of Maryland, has no assets in Maryland, and has not leased or owned property in Maryland.

Plaintiffs Richard and Joseph Stanton executed written employment contracts with Defendant TaaSera, Inc. Their respective Consulting Contracts provided that Pennsylvania law was to govern the terms of the parties dealings.

The Complaint filed herein avers Defendant TaaSera, Inc., violated Md Code Ann. Lab & Empl. §3-501 et. seq. Plaintiffs Stanton were not, nor were they ever, Maryland employees of Defendant TaaSera, Inc., pursuant to their Contracts. Their Contracts specifically provide that the parties dealings are to be governed by Pennsylvania law and as such the application of Md Code Ann. Lab & Empl. §3-501 et. seq. is inappropriate.

Plaintiff filed a one Count Complaint alleging a violation of Md Code Ann. Lab & Empl. §3-501 et. seq. Not one component of this lawsuit touches or concerns Defendant TaaSera, Inc.'s,

activities within the State of Maryland.  Defendant TaaSera, Inc., lacks contacts with the State of Maryland sufficient to subject the non-resident Defendant corporation to the jurisdiction of a Maryland Court.  As Md Code Ann. Lab & Empl. §3-501 et. seq.  is inapplicable to the parties dealings, Plaintiff has also failed to state a claim upon which relief can be granted.

Notwithstanding all of the failings in the Complaint noted supra, Plaintiffs Richard and Joseph Stanton executed written employment contracts with Defendant TaaSera, Inc.   The employment contracts mandate that before taking any adversarial action, they must serve upon Defendant TaaSera, Inc., a "dispute notice" which neither Plaintiff did.

Plaintiffs Richard and Joseph Stanton's executed written employment contracts with Defendant TaaSera, Inc., also mandate that the parties submit to arbitration in Pittsburgh, PA to arbitrate any disagreements arising under their employment contracts.  Plaintiffs Richard and Joseph Stanton failed to demand arbitration in accordance with the terms of their contract.

Based upon all of the above, this Court does not have jurisdiction upon the non-resident Defendant TaaSera, Inc.; and,

Based upon all of the above, the Plaintiffs have failed to state a claim upon which relief may be granted by this Court; and accordingly:

It is hereby ORDERED that the Motion of Defendant TaaSera, Inc., shall be and is hereby GRANTED, and that this case shall be and is hereby DISMISSED; and it is further,

ORDERED that within 10 days of this ORDER, Plaintiff shall pay to the Defendant his reasonable attorneys fees and costs in the amount of $ _____.

IT IS SO ORDERED.

_____
JUDGE, Circuit Court for Montgomery County

## IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

Joseph Stanton
Richard Stanton
     Plaintiff.s

       v.

TaaSera, Inc.
175 S. Main Street 500
Defendants

Civil
Case No.: 444457V

## MEMORANDUM OF POINTS AND AUTHORITIES
### IN SUPPORT OF DEFENDANTS MOTION TO DISMISS

Plaintiffs Richard and Joseph Stanton sued Defendant TaaSera, Inc. in a one count complaint alleging, inter alia, that they are owed unpaid wages pursuant to Maryland's Wage payment and Collection Act. (Md Code Ann. Lab & Empl. §3-501 et. seq.).

Plaintiffs' lawsuit must be dismissed.

In support of this Court exercising its jurisdiction, in their Complaint the Plaintiffs aver that:

    a.    Defendant TaaSera, Inc. is doing business in Maryland because it employed Plaintiffs Richard and Joseph Stanton who both reside in Maryland;

    b.    Defendant TaaSera, Inc., is a Pennsylvania corporation[7];

    c.    Defendant TaaSera, Inc.'s principal offices are in Utah;

    d.    Defendant TaaSera, Inc., has "other substantial" contacts with Montgomery County, MD;

    e.    Jurisdiction is proper before this Court pursuant to MD Code Ann. CJP §4-401 and MD Code Ann. St. Gov't §20-1013.

I.    **This action against Defendant TaaSera, Inc., must be dismissed because this Court lacks in personam jurisdiction over the non-resident Defendant TaaSera, Inc., pursuant to MD Code Ann. CJP §4-401 and MD Code Ann. State Government, §20-1013.**

The burden of alleging and proving the existence of a factual basis for the exercise of *in*

---

[7]    As noted supra, Defendant TaaSera, Inc., is a Delaware corporation.

*personam* jurisdiction, once it is placed in controversy, rests with the Plaintiff. McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 189, 56 S.Ct. 780 (1936). In the pleadings filed to date, the Plaintiffs have to prove the existence of a factual basis for such jurisdiction as to the non-resident Defendant TaaSera, Inc.

In their Complaint, Plaintiffs cite as authority MD Code Ann. CJP §4-401 for this Court's exercising of its jurisdiction. MD Code Ann. CJP §4-401 provides, inter alia:

§ 4-401. Exclusive original jurisdiction of court
Except as provided in § 4-402 of this subtitle, and subject to the venue provisions of Title 6 of this article, the District Court has exclusive original civil jurisdiction in:

(1)   An action in contract or tort, if the debt or damages claimed do not exceed $30,000, exclusive of prejudgment or postjudgment interest, costs, and attorney's fees if attorney's fees are recoverable by law or contract;

MD Code Ann. CJP §4-401 applies to the jurisdiction of the District Court. The Plaintiffs filed their case in the Circuit Court for Montgomery County, MD, not the District Court of MD for Montgomery County. Plaintiffs reliance upon MD Code Ann. CJP §4-401 is misplaced and is inapplicable here.

In their Complaint, Plaintiffs also cite to MD Code Ann. State Government §20-1013 as authority for this Court's exercising its jurisdiction. Plaintiffs reliance upon MD Code Ann. State Government §20-1013 is similarly misplaced.

MD Code Ann. State Government §20-1013. Civil action by complainant provides, inter alia:

In general
(a) In addition to the right to make an election under § 20-1007 of this subtitle, a complainant may bring a civil action against the respondent alleging an unlawful employment practice, if:

(1)   the complainant initially filed a timely administrative charge or a complaint under federal, State, or local law alleging an unlawful employment practice by the respondent;
(2)   at least 180 days have elapsed since the filing of the administrative charge or complaint; and
(3)   the civil action is filed within 2 years after the alleged unlawful employment practice occurred.

Plaintiff never filed an administrative charge or a complaint pursuant to MD Code Ann. State Government §20-1007. Plaintiffs Stanton cannot pass the SECOND prong of the §20-1013(a)(1)

mandate.  For all of the above reasons, this action must be dismissed as to Defendant TaaSera, Inc.

II.   **This case must be dismissed because this Court lacks in personam jurisdiction under the Constitution over the non-resident Defendant TaaSera, Inc., due to a lack of minimum contacts within the State of Maryland.**

The Supreme Court has enunciated the limits of in personam jurisdiction under the Due

Process Clause.  Asahi Metal Indus. v. Superior Court of Cal., 480 U.S. 102, 107 S.Ct. 1026, 94

L.Ed.2d 92 (1987) (plurality opinion);  World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286,

100 S.Ct. 559, 62 L.Ed.2d 490 (1980);  Shaffer v. Heitner, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d

683 (1977);  McGee v. International Life Ins. Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957);

International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).  These

decisions establish that a defendant must have sufficient "minimum contacts" with the forum state

so that maintenance of the suit does not offend "traditional notions of fair play and substantial

justice." International Shoe, 326 U.S. at 316, 66 S.Ct. at 158.

The Due Process Clause forbids the exercising of personal jurisdiction under circumstances

that would offend traditional notions of fair play and substantial justice,  In a determination of

whether it would be fair and just to permit a trial court to exercise jurisdiction over a non-resident

defendant, the court must consider the burden imposed on an out-of-state defendant if he is

compelled to defend himself in a distant locale.  If the burden on the defendant would outweigh the

interests the forum had to hear the claim and the plaintiff's interest to obtain relief, the matter may

be properly dismissed. Asahi supra.

The standards to be applied by this Court determining whether it may exercise personal

jurisdiction over a non-resident defendant is whether "the Defendants [have] "purposefully availed"

itself of the privilege of conducting activities within [Maryland] [so that the exercise of] long-arm

jurisdiction... would [not] violate protections, accorded nonresidents by the Due Process Clause of

the federal constitution".  Witbeck v. Bill Cody's Ranch Inn, 428 Mich 659, 411 N.W.2d 439, 411

(1987).

The "purposeful availment requirement ensures that a defendant will not be haled into a

jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts... or of the 'unilateral activity of another party or a third person.'" <u>Burger King v. Rudzewicz</u>, 471 U.S. 462, 105 S.Ct. 2174, 2183 (1985).

Thus, the Supreme Court has found that the Due Process Clause;

> forbids the exercise of personal jurisdiction over an out-of-state automobile distributor whose only tie to the forum resulted from a customer's decision to drive there; over a divorced husband sued for child-support payments whose only affiliation with the forum was created by his former spouse's decision to settle there; and over a trustee whose only connection with the forum resulted from the settlor's decision to exercise her power of appointment there.

<u>Id</u>., n. 17.

In <u>Hansen v. Denckla</u>, 357 U.S. 235, 251 (1958) the Supreme Court noted that:

> It is a mistake to assume... the eventual demise of all restrictions on the personal jurisdiction of... courts. Those restrictions are more than a guarantee of immunity from inconvenient of distant litigation.  They are a consequence of territorial limitations on the power of the respective States.

In its further analysis of this issue, the Supreme Court in <u>Hansen</u> determined that the quality and quantity of contacts to support the exercise of personal jurisdiction would depend upon the nature of the action brought and the nexus of the contacts to the subject matter of the action.  The Court deemed it essential that there be some act by which a defendant purposefully avails itself of the privilege of conducting activities within the forum State, in order for jurisdiction to arise. <u>Hansen</u>, at 253.

For "it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted." <u>Burger King Corp. v. Rudzewicz</u>, supra, 105 S. Ct. at 2184 (1985).

The Supreme Court, in <u>Burger King</u> delineated the criteria by which trial courts must evaluate a plaintiff's assertion that jurisdiction lies to proceed against particular defendants.  The Supreme Court examined the criteria needed to find that a court has jurisdiction to adjudicate a breach of contract action, and determined that a defendant purposely availed itself of the privilege of

conducting business in the forum state.  Thus, where the defendant had;

    i)    signed a contract which was the subject of the litigation by which the defendant voluntarily and expressly agreed to the forum's jurisdiction;

    ii)   where the defendant had constant contact with the forum;

    iii)  where the defendant was not unfairly surprised by the contract's requirement for forum jurisdiction;

    iv)  where the defendant could reasonably anticipate out of state litigation.

In the context of commercial litigation, the Supreme Court has further determined that the defendant must have a "substantial connection" with the forum state necessary to find the minimum contacts which comes about by the defendant's <u>purposeful availment</u> directed towards the forum state.  The mere introduction of a product into the "stream of commerce" is not sufficient to result in, <u>in personam</u> jurisdiction.

The Supreme Court in <u>Denckla</u> provided its reasoning as to why it would offend traditional notions of fair play for the non-resident defendant be subjected to defend oneself in a foreign jurisdiction.  In dicta, the Court reasoned:

[T]he foreseeability that is critical to due process analysis ... is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into Court there.  [citations omitted]  In determining when a foreign defendant should reasonably anticipate being "haled into court" in the forum state, the Supreme Court has provided this guidance: "The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State.  The application of that rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some **act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State,** thus invoking the benefits and protections of its laws."

<u>Hanson v. Denckla</u>, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958).  [emphasis added]

This "purposeful availment" requirement insures that a defendant will not be haled into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts, or as the result of the "unilateral activity of another party or a third person," [citations omitted].

The <u>Ashai</u> Court established a "test" to determine whether a non-resident defendant had sufficient minimum contacts such that it had purposeful availed itself to the forum.  The criteria for a finding that those minimum contacts existed with purposeful availment in a commercial setting

are the:

    i)      defendant's intent or purpose to serve the forum state's market;
    ii)    defendant's designing a product for the forum state's market;
    iii)   defendant's advertising in the forum state;
    iv)   defendant's establishing channels to advise customers in the forum state; or
    v)    defendant's marketing of a product via a distributing agent within the forum state.

1.    **Defendant TaaSera, Inc. lacks sufficient contacts with the State of Maryland for personal jurisdiction to attach to it here[8].**

At all times relative to the instant matter, Defendant TaaSera, Inc., (hereinafter sometimes referred to as: "TaaSera") was a Delaware Corporation that did not do business in the State of Maryland. TaaSera voluntarily terminated its registration to do business in Maryland more that three (3) years prior to the filing of this case. Plaintiffs seemly admit that TaaSera's sole contacts, if such constitutes a "contact", is that it entered into employment contracts with Plaintiffs Stanton to work out of TaaSera's Tysons, VA office suite.

Plaintiffs incorrectly represent that TaaSera is a Pennsylvania corporation.

Plaintiffs do not provide details was to why jurisdiction is proper before this Court other than citing to Md Code CJP related to the jurisdiction of the District Court of Maryland, and MD Code Ann. State Government §20-1013, both of which are inapplicable to this case.

Plaintiffs fail to identify in their Complaint that their Association with TaaSera was governed by a written contract that specifically provides that Maryland law is not controlling to the parties dealings. The transaction that gives rise to the parties association is a contract that provides for the application of the laws of Pennsylvania.

Defendant TaaSera, Inc., is not alleged by Plaintiff:

i.    To have any offices in Maryland, nevertheless Montgomery County;

ii.    To own property in Maryland, nevertheless Montgomery County;

iii.   To conduct business in Maryland, nevertheless Montgomery County;

iv.   To have directed goods or services to Maryland, nevertheless Montgomery County;

---

[8]    TaaSera incorporates by reference the Affidavit of CEO Eric Hale with the instant Motion and Memorandum.

v.      To have committed a tort in Maryland, nevertheless Montgomery County.

At all times relative to facts that give rise to this litigation, Defendant TaaSera, Inc., was a Delaware Corporation.  Defendant TaaSera, Inc., operated, for a short period of time, a temporary sales office in Tysons, Virginia that was closed in the first quarter of 2016.

As noted supra, TaaSera did not:

i.      contract for services in Maryland;

ii.     own property in Maryland;

iii     register nor was it licensed to do business in Maryland[9];

iv.     file taxes in Maryland;

v.      supplied any goods, services or manufactured products in or for the State of Maryland;

vi.     conduct or transact business in Maryland; and,

vii.    rent offices in Maryland.

The cold facts here are, Defendant TaaSera, Inc., did absolutely nothing to purposely avail itself of the State of Maryland.  To the contrary, at all times relative to the instant matter, Taasera had no connects with the State of Maryland. No contract exists that is the subject of this litigation which subjects Taasera, voluntarily to the jurisdiction of a Maryland Court.  Taasera has not had any systematic or continuous contacts with the State of Maryland.  It is impossible for the Plaintiffs to defend a position whereby it maintains that Taasera could reasonably anticipate to be involved in litigation within the State of Maryland. Plaintiffs attempt to invoke the jurisdiction of the Circuit Court for Montgomery County, Md over the non-resident Taasera greatly offends traditional notions of fair play and substantial justice.

For all of the above reasons, this action must be dismissed as to Defendant TaaSera, Inc.

---

[9]      See: TaaSera's 2013 filing with MD-SDAT: Application for Termination for a Foreign Corporation Qualification, Exhibit 2.

2.     **Defendant TaaSera, Inc., is not subject to the jurisdiction of the Montgomery County Circuit Court based upon any of the factors listed in Maryland jurisdiction statutes.**

In personam jurisdiction does not attach to Defendant TaaSera, Inc., pursuant to Md CJP Code Ann. §6-102. Persons domiciled in, organized under laws of, or maintaining principal place of business in State. As noted above, Defendant TaaSera, Inc., was never "domiciled" in Maryland, nor does it maintain a principal place of business in Maryland.

In personam jurisdiction does not attach to Defendant TaaSera, Inc., pursuant to Md CJP Code Ann §6-103. Cause of action arising from conduct in State or tortuous injury outside State. To wit:

(b)(1) Transacts any business or performs any character of work or service in the State;

> TaaSera has not transacted business nor performed work or services in Maryland.

(b)(2) Contracts to supply goods, food, services, or manufactured products in the State;

> TaaSera has not contracted to supply goods, food, services or manufactured products in Maryland.

(b)(3) Causes tortuous injury in the State by an act or omission in the State;

> This is a contract case, not one involving a tortuous injury in Maryland.

(b)(4) Causes tortuous injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State;

> As noted above, none of the above conditions are applicable here.

(b)(5) Has an interest in, uses, or possesses real property in the State;

> None.

(b)(6) Contracts to insure or act as surety for, or on, any person, property, risk, contract, obligation, or agreement located, executed, or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing.

> Not applicable. TaaSera, Inc., is not an insurer or surety. The applicable contract here is governed under Pennsylvania law.

**II**  **The Plaintiffs' Employment Contracts mandate that they submit to Arbitration in Pittsburgh, PA for any compensation controversy arising thereunder, and as such, the Circuit Court is devoid of jurisdiction.**

Paragraph 13. of the Plaintiffs' Employment Contracts provide, inter alia;

13.     Consequence of Termination of Employment or Change of Control.
(d) <u>Dispute Resolution for Compensation Rewards Following Termination of Employment</u>
In the event a dispute arises between Employee and Company with respect to whether any Compensation Rewards are payable to Employee following termination of Employee's employment, Employee shall notify the chief executive officer of Company in a writing (the "Dispute Notice") of such dispute within 30 days after Employee obtains knowledge of the amount of the Compensation Rewards (if any), being paid by Company to Employee.... The Dispute Notice shall identify the Compensation Rewards that are in dispute and shall describe in reasonable detail the position of Employee with respect thereto.

Paragraph 22 of the Plaintiffs' Employment Contracts provide, inter alia;

22. Arbitration; Waiver of Jury Trial.
(a) Any dispute or controversy arising under, out of, in connection with or in relation to this Agreement may, at the election and upon written demand of either Employee or Company and the consent of the other, be finally determined and settled by arbitration before a panel of three arbitrators to be held in Pittsburgh, Pennsylvania in accordance with the rules and procedures of the American Arbitration Association...

Neither Plaintiff Richard or Joseph Stanton served upon Taasera a "Dispute Notice." Neither Plaintiff Richard or Joseph Stanton served upon Taasera a request to Arbitrate. The failure to serve "Dispute Notice" to TaaSera is a condition precedent to the filing of litigation to see relief for a "compensation reward" recovery.

Additionally, Plaintiffs never afforded TaaSera with the right to demand arbitration.  Under the provisions of paragraph 22, either party has the right to demand arbitration, which then can either be accepted or rejected.  Here, the Plaintiffs have not afforded TaaSera its rights under paragraph 22.

Any doubts concerning the scope of arbitral issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay or a like defense to arbitrability. 9 USCA §§ 1-16.

<u>Murry v United Food and Comm'l Workers Intern. Union</u>, 289 F. 3d 297, on remand 22 F. Supp. 2d. 465, 2002.

Arbitration is the process whereby parties voluntarily agree to substitute a private tribunal for the public tribunal otherwise available to them. Arbitration is a matter of contract which the parties should be allowed to conduct in accordance with their agreement."' <u>Kovacs v. Kovacs</u>, 98 Md.App. 289, 300, 633 A.2d 425 (1993), cert. denied, 334 Md. 211, 638 A.2d 753 (1994) (quoting <u>Gold Coast Mall Inc. v. Larmar</u>

Corp., 298 Md. 96, 103, 468 A.2d 91 (1983)). It is often favored because it usually provides a speedy, informal, and less expensive alternative to litigation. Birkey Design Group v. Egle Nursing Home, Inc., 113 Md.App. 261, 265, 687 A.2d 256 (1997); Marsh v. Loffler Housing Corp., 102 Md.App. 116, 648 A.2d 1081 (1994). As an added benefit, arbitration facilitates the reduction of the court's docket. Birkey, 113 Md.App. at 265, 687 A.2d 256.

cf. Blitz V. Beth Isaac Adas Israel Congregation, 694 A.2d 107, 15 Md.App. 460, 476 (Md. App., 1996).

Plaintiffs, via the filing of this lawsuit, have not met all conditions precedent to their seeking relief from the Court. As such, this lawsuit is not ripe.

## CONCLUSION

As more thoroughly discussed and analyzed herein, this Court does not meet the Constitutional basis to exercise in personam jurisdiction over the non-resident Defendant TaaSera, Inc. Plaintiffs Stanton have also failed to state a claim upon which relief can be granted. Any rights that the Plaintiffs had, or may have had against Defendant TaaSera, Inc., are to be found in another jurisdiction, but not in a Maryland Court. Plaintiffs lawsuit is also not ripe pursuant to the terms of their Employment Agreements.

Respectfully,

Stephen A. Shechtel, Esq.
Shechtel and Shechtel, P.A.
17 W. Jefferson Street Ste. 205
Rockville, MD 20850
phone:          301-309-1440
email:          stephen@shechtel.com



Delaware.gov

Governor | General Assembly | Courts | Elected Officials | State Agencies

Logout

**Department of State: Division of Corporations**

Allowable Characters

### View Search Results

---

#### Entity Details

| | | | |
|---|---|---|---|
|  | **5008259** |  | **7/8/2011** (mm/dd/yyyy) |
|  | **TAASERA, INC.** | | |
|  | **Corporation** |  | **General** |
|  | **Domestic** |  | **State:** |
|  | **Good Standing** |  | **11/15/2017** |

#### REGISTERED AGENT INFORMATION

| | | | |
|---|---|---|---|
|  | **CORPORATION SERVICE COMPANY** | | |
| | **251 LITTLE FALLS DRIVE** | | |
| | **WILMINGTON** |  | **New Castle** |
|  | **DE** |  | **19808** |
| | **302-636-5401** | | |



For help on a particular field click on the Field Tag to take you to the help area.

site map  |  privacy  |  about this site  |  contact us  |  translate  |  delaware.gov



**DEFENDANT'S EXHIBIT**

# Delaware

PAGE   1

### The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "TAASERA, INC." IS DULY INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL CORPORATE EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE TWENTY-FOURTH DAY OF MAY, A.D. 2012.

AND I DO HEREBY FURTHER CERTIFY THAT THE SAID "TAASERA, INC." WAS INCORPORATED ON THE EIGHTH DAY OF JULY, A.D. 2011.

AND I DO HEREBY FURTHER CERTIFY THAT THE FRANCHISE TAXES HAVE BEEN PAID TO DATE.

AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL REPORTS HAVE BEEN FILED TO DATE.

Jeffrey W Bullock, Secretary of State

AUTHENTICATION: 9597034

DATE: 05-24-12

5008259   8300

120632377

You may verify this certificate online
at corp.delaware.gov/authver.shtml

# CORPORATE CHARTER APPROVAL SHEET
## * KEEP WITH DOCUMENT *

DOCUMENT CODE 35        BUSINESS CODE _____

# F14700371

Close _____      Stock _____      Nonstock _____

P.A. _____      Religious _____

Merging  (Transferor) _____

_____

_____

_____

_____

Surviving (Transferee) _____

_____

_____

**1000362005031044**

ID # F14700371 ACK # 1000362005031044
PAGES: 0003
TAASERA, INC.

04/05/2013  AT 04:16 P WO # 0004122197

New Name _____

### FEES REMITTED

| | |
|---|---|
| Base Fee: | 25 |
| Org. & Cap. Fee: | |
| Expedite Fee: | |
| Penalty: | |
| State Recordation Tax: | |
| State Transfer Tax: | |
| Certified Copies | |
| Copy Fee: | |
| Certificates | |
| Certificate of Status Fee: | |
| Personal Property Filings: | |
| Mail Processing Fee: | |
| Other: | |
| **TOTAL FEES:** | **25** |

_____ Change of Name
✓ Change of Principal Office
_____ Change of Resident Agent
_____ Change of Resident Agent Address
_____ Resignation of Resident Agent
_____ Designation of Resident Agent
          and Resident Agent's Address
_____ Change of Business Code

_____ Adoption of Assumed Name
_____

_____ Other Change(s)
_____
_____

Credit Card _____    Check _____    Cash _____

_____ Documents on _____ Checks

Approved By: _16_____

Keyed By: _____

COMMENT(S): _____

Code _____

Attention: _____

Mail: Name and Address

TAASERA, INC.
M312
2107 PINEY BRANCH CIRCLE
HANOVER MD 21076

CUST ID:0002905617
WORK ORDER:0004122197
DATE:04-09-2013 06:16 PM
AMT. PAID:$25.00

DEFENDANT'S
EXHIBIT
2
ALL-STATE LEGAL®

# APPLICATION FOR TERMINATION FOR A FOREIGN CORPORATION QUALIFICATION

Pursuant to the provisions of Title 7-208 of the Corporations and Associations Article of the Annotated Code of Maryland, the undersigned corporation hereby applies to the Department of Assessments and Taxation for a certificate of termination from the State of Maryland; and as part of such Application the undersigned Corporation hereby certifies to the Department as follows:

(A) The name of the Corporation is Taasera, Inc.

(B) The street address of the principal office of the Corporation in the State of Maryland is

2107 Piney Branch Circle #312; Hanover, MD  21076

(C) The name and street address of the resident agent, service of process upon whom shall bind the Corporations

in any action in which the Corporation is subject to suit in the State of Maryland are CSC - Lawyers Incorporating

Service Company; 7 St. Paul Street; Suite 1660; Baltimore MD  21202

(D) The Corporation is qualified to do intrastate business as a foreign corporation in the State of Maryland, is no longer transacting any intrastate business in the State of Maryland, and wishes to terminate its qualification to do business.

(E) The Corporation has filed all reports as required by the laws of the State of Maryland and has paid all taxes due and payable by it to the State of Maryland and any political subdivision of the State of Maryland to the date of this Application for withdrawal.

Dated:  4-3-13                                        By: _____

I hereby consent to my designation in this document as resident agent for this corporation.

SIGNED  Kellen Cokefer, Assi. Secretary
                                    Resident Agent

Revised 9/99

CUST ID:0002905617
WORK ORDER:0004122197
DATE:04-09-2013 06:16 PM
AMT. PAID:$25.00

2013 APR -5 P 2:16
RECEIVED
DEPARTMENT OF
ASSESSMENTS & TAXATION

## PERSONAL PROPERTY AFFIDAVIT FOR A FOREIGN CORPORATION
### FILING TERMINATION BETWEEN JANUARY 1 AND
### APRIL 15 WHICH OWNS NO TANGIBLE PERSONAL PROPERTY AS
### OF JANUARY 1 OF THE SAME CALENDAR YEAR

RE:   TaaSERA, Inc.
        F14700371

(a corporation.incorporated under
the Laws of Delaware)

The undersigned officer of the captioned corporation does hereby swear under the penalties of perjury that the said corporation owned no tangible personal property as of January 1 of the current calendar year.

Dated: April 3, 2013

Name:  Kurt F. Buseck
Title:    Chief Financial Officer



**MARYLAND BUSINESS EXPRESS**

Want to PLAN, START, MANAGE, or GROW your business?
▶ Click HERE!

## ⊘ Maryland Business Express

🏠 Home | 🔒 Log In / Create Account

# TAASERA, INC.: F14700371

| General Information | Filing History | Annual Report/Personal Property |

## General Information

**Department ID Number:**
F14700371

**Business Name:**
TAASERA, INC.

**Principal Office:**
STE 312
2107 PINEY BRANCH CIR
HANOVER MD 21076

**Resident Agent:**
CSC-LAWYERS INCORPORATING
SERVICE
COMPANY
7 ST. PAUL STREET, SUITE 1660
BALTIMORE MD 21202

**Status:**
DISSOLVED

**Good Standing:**
THIS BUSINESS IS **NOT IN GOOD STANDING**
What does it mean if a business entity is not in good standing or forfeited?
» Order Certificate of Status

**Business Type:**
FOREIGN CORPORATION

Business Code:
03 ORDINARY BUSINESS - STOCK

Date of Formation/ Registration:
05/29/2012

State of Formation:
DE

Stock Status:
STOCK

Close Status:
N/A

Q New Search        Order Documents

Privacy and Security Policy | Accessibility Policy

**FOR FILING AND BUSINESS RELATED QUESTIONS**
Maryland Department of Assessments & Taxation
**410-767-1184 | Outside the Baltimore Metro Area: 888-246-5941**
Maryland Relay: 800-735-2258

**FOR TECHNICAL QUESTIONS AND SUPPORT**
NIC Maryland, eGov Services Partner of the Department of Information Technology (DoIT) and
Maryland.gov
» Click for 24/7 Support

SECURED

## CONSULTING AGREEMENT

THIS AGREEMENT is made and entered into this _3rd_ day of _AUGUST_, 2012, by and between Taasera, Inc., a Delaware corporation ("the Company"), and _RICHARD P. STANTON_ ("Consultant").

## RECITALS

WHEREAS, the Company's business includes the development and sale of computer and network security technology;

WHEREAS, because such fields are highly competitive in terms of the technology, customers, designs and other matters, as well as in attracting qualified professionals to work therein, the Company has a legitimate interest in lawfully protecting the competitive advantages it has developed at great effort and expense; and

WHEREAS, Consultant recognizes that the Company has legitimate need for restricting Consultant's activities which would be contrary to the Company's interests.

NOW, THEREFORE, in consideration of the initiation of a consulting relationship between the Company and Consultant and for other good and valuable consideration, the parties, intending to be legally bound hereby, agree as follows:

1. Consultant acknowledges that, during the course of the relationship with the Company, Consultant will have access to and become familiar with various confidential information and trade secrets including, but not limited to, those concerning the Company's software, systems, plans, procedures, facilities, equipment, staff, fee and cost structures, customer lists, marketing plans, contacts, computer programs, compilations of information, client data, financial condition, and budgets, trends and strategic plans, which are all of a confidential and secret nature, are the sole and exclusive property of the Company, and are of great value to the Company. Consultant agrees never to divulge to anyone or to make use of such information, either during or after the term of this Agreement, unless directed to or given permission by an authorized representative of the Company. Consultant agrees to deliver to the Company upon demand and to make no further use of any and all papers, reports, programs, software, plans, documents, equipment of any nature provided to Consultant by or in connection with the Company or developed by Consultant in the performance of services for the Company. All files, records, documents, lists, specifications, equipment, papers and similar items prepared by the Consultant or otherwise coming into his/her possession, shall remain the exclusive property of the Company, and shall not be removed from the premises of the Company or photocopied under any circumstances whatsoever without the prior written consent of the Company.

2. Consultant understands that, during the course of Consultant's work for the Company confidential information may be divulged or may become known to Consultant that is the result of others entrusting information to the Company, and Consultant agrees to treat such information in accordance with the confidentiality and non-use obligations as detailed in Paragraph 1 above.

DEFENDANT'S EXHIBIT
3
ALL-STATE LEGAL®

3. Consultant agrees that, in the course of performing services for the Company, Consultant will not breach any agreement or obligation Consultant may have with another with respect to confidential information. Consultant agrees not to bring to the Company or use in Consultant's work for the Company any information, materials or documents obtained from others under an agreement of confidentiality.

4. Information or data that has lawfully and without violation of a confidentiality obligation entered the public domain shall not be considered to be encompassed by the obligations in Paragraphs 1, 2, or 3 above.

5. Consultant agrees that all inventions, discoveries, developments, computer programs and reports that Consultant makes, conceives or develops in the course of consulting for the Company, whether or not patentable or copyrightable (collectively, "works"), shall become and remain the sole property of the Company. Consultant will notify the Company promptly and in writing of such works. Consultant hereby transfers and assigns all right, title, copyright and interest in such works to the Company and will from time to time give the Company all reasonable assistance, execute all papers and do all things that may reasonably be required to protect and preserve the rights of the Company in such works.

6. Return of Property: Consultant agrees, upon Company's request for any reason whatsoever, to return to an officer of the Company all records, equipment, copies of records, documents, client and employee lists, files, drawings, manuals, programs, proposals, business cards, directories, specifications, papers and any documents concerning the Company's customers or the Company's products or processes, which Consultant may have; and in the event Consultant shall violate this Agreement, Consultant shall forfeit all claims to unpaid compensation without affecting the right of the Company to compel the return of said records, equipment, copies of records, documents, lists, files, drawings, manuals, business cards, calendars, directories, specifications, paper and similar items. In the event that Consultant shall have purchased any of the above-referenced materials, he shall be reimbursed by the Company upon presentation of an expense report, together with receipts.

7. Miscellaneous Provisions:

a. Consultant agrees that the Company would be irreparably harmed by a violation of this Agreement and that monetary damages for such breach would not be readily calculable and that the Company would not have an adequate remedy at law therefor and Consultant acknowledges, consents and agrees that the Company shall be entitled to equitable relief, including injunctive relief and/or specific performance, in the event of any actual, threatened or likely breach of this Agreement, in addition to all other remedies available to the Company at law or in equity.

b. The Company and Consultant acknowledge that the covenants and terms of this Agreement are intended to benefit not only the Company, but also its successors, subsidiaries, and affiliates. Accordingly, the Consultant agrees that the Company may assign this Agreement to any person, partnership, or corporation that purchases or is purchased by the Company, as well as to any other Company subsidiary or affiliate. These persons and other entities shall succeed to the rights and obligations of this Agreement and may enforce the terms of the Agreement in their

own behalf or in the name of the Company.

       c. This head office of the Company is in Erie, PA. Accordingly, this agreement shall be governed by the laws of the Commonwealth of Pennsylvania as those laws are applied by the Pennsylvania courts to contracts between Pennsylvania residents made and to be performed within Pennsylvania. If any provision of this Agreement is found by a court of competent jurisdiction to be unenforceable, in the court's discretion, that provision may be modified or severed and the remainder of this Agreement shall continue in full force and effect. If a court of competent jurisdiction determines that any term or provision of this Agreement is invalid or unenforceable because of the duration thereof or the geographical area included therein, the parties expressly agree that the court shall have the power to reduce the duration and/or geographical area of such term or provision. Any waiver, modification or amendment of any provision of this Agreement shall be effective only if made in writing.

Taasera, Inc.

Consultant Signature

By:

Title:

8/3/12

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "Agreement") is dated December ___, 2012, and made effective as of July 15, 2012 (the "Effective Date") by and between Taasera, Inc., a Delaware corporation (the "Company"), and Richard P. Stanton (the "Employee") (Company and the Employee, collectively, the "Parties").

## RECITALS

WHEREAS, Company's business includes the development and sale of computer and network security technology (the "Business");

WHEREAS, Employee and Company have entered into that certain Consulting Agreement, dated August 20, 2012 (the "Consulting Agreement"), which governs the relationship between the Parties until the Start Date (defined below) of this Agreement, whereby Employee is a consultant to Company, independently performing some of the duties required of him hereunder;

WHEREAS, Employee and Company would like to enter into an arrangement for Employee to work for Company in exchange for compensation and other benefits, as more specifically set forth in this Agreement;

WHEREAS, because the Business is highly competitive in terms of the technology, customers, designs and other matters, Company and Employee recognize that Company has a legitimate interest in protecting certain confidential information about the Business; and

WHEREAS, Employee and Company wish to enter into an employer-employee relationship, under the terms of this Agreement, all as more fully set forth herein.

## AGREEMENT

NOW, THEREFORE, for and in consideration of the Recitals set forth above, which are hereby incorporated into this Agreement, the terms and mutual covenants contained herein, and other consideration the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, Company and Employee hereby agree as follows:

1. Employment.

Company agrees to employ Employee, and Employee agrees to be employed by Company, on the terms and conditions contained herein.

2. Term.

The term of employment of Employee under this Agreement shall commence on the date of the initial Series A Closing (defined below) (the "Start Date") and shall continue until the first anniversary of the Start Date (the "Initial Term"), and, unless earlier terminated pursuant to the provisions of this Agreement, shall be automatically extended thereafter for additional one-year terms (each term, a "Renewal Term") on the same terms and conditions contained

{01418365}

herein in effect as of the time of such extension (such Initial Term and each Renewal Term are referred to herein as the "Term").

3.  Positions and Responsibilities.

(a)  General. Employee will hold the position of Vice President of Legal and Government Affairs with Company and will report to the chief executive officer. Employee will have the powers and responsibilities consistent with such position, as are more specifically outlined in Section 3(b) below and as such powers and responsibilities are designated by the chief executive officer or board of directors of Company during the Term, and on the conditions set forth in this Agreement.

(b)  Responsibilities of Employee. Employee shall initially be responsible for the following duties:

(i)  To advise board of directors of Company on matters related to corporate compliance, corporate governance and government affairs;

(ii)  Selection, review and oversight of corporate counsel;

(iii)  To assist in the overall development of the long-term strategy of Company;

(iv)  Such other duties that are commensurate with Employee's position and may be assigned to Employee by Company from time to time.

Company will not make changes to Employee's reporting chain or duties and responsibilities in any manner which: (x) materially increases the scope of work of Employee's position or the time, attention or skill level necessary for Employee to perform his duties under this Agreement; or (y) result in the material diminution of Employee's scope of authority, responsibilities or titles under this Section 3. Any failure of Employee to consent to a change of Employee's duties and responsibilities in subsection (x) of the preceding sentence will not be considered unreasonable, if such denial is related to compensation (or lack thereof) to Employee connected to such additional scope of work, time, attention or skill level required by such change. Company and Employee further acknowledge and agree that subsection (y) in this paragraph does not apply to a termination under Section 13 below. Further, Employee acknowledges and understands that Company has no obligation to pursue or engage in any business or financial transaction that may result from Employee's completion of the duties and responsibilities ascribed to him under this Agreement, even if Employee has performed all of the services requested by Company.

4.  Duties; Company Policies; Unrelated Activities.

During the period of employment with Company, Employee shall faithfully perform the duties of his position and devote the necessary time, attention, skill and best efforts to such duties. Such duties are to be conducted in accordance with reasonable business judgment practices and in compliance with the lawful business policies of Company, as may be set forth in written materials developed by Company and as may be amended from time-to-time (collectively, the "Company Policies").

Employee is an employee, but may engage in other for profit, political, charitable, trade, professional, community or other activities from time to time that are unrelated to Employee's employment with Company, provided that such activities are not otherwise prohibited by this Agreement and do not interfere with Employee's duties hereunder ("Unrelated Activities"). Employee agrees not to undertake or permit to be undertaken any Unrelated Activities in the name of Company or using Company resources. Employee shall not represent or imply, and shall not permit the representation or implication, that Company supports his Unrelated Activities. If Company reasonably asks Employee to provide Company with non-confidential information or information regarding, or to disclaim Company's involvement in, his Unrelated Activities, Employee shall promptly do so.

5.      Compensation and Benefits.

For all services rendered by Employee under this Agreement and, for purposes of subsection (a) of this Section 5, the Consulting Agreement, and while Employee is employed by Company pursuant to this Agreement, Company will compensate Employee as follows:

(a)      Consulting Fees.  Prior to the Term, Employee and Company maintained a relationship governed by the Consulting Agreement. The Parties agreed, and now hereby acknowledge and affirm, that for the services provided by Employee to Company pursuant to the Consulting Agreement, Employee shall accrue compensation in the amount of $12,500 for each month from the Effective Date until the Start Date, prorated for partial months (the "Consulting Fees"). The Consulting Fees shall be paid in full on the Start Date. At the time of payment of the Consulting Fees, Employee, in Employee's sole discretion, may elect to invest the Consulting Fees in Company's Series A Preferred Stock on the same terms as other investors therein.

(b)      Base Salary. During the Term, Employee shall receive an annual base salary (the "Base Salary") of $150,000.  The Base Salary may be increased (but not decreased) by the board of directors of Company from time to time, in its sole discretion.  The Base Salary shall be paid periodically in accordance with Company's payroll practices and shall be subject to withholding.

(c)      Equity Participation.

(i)      Pursuant to that certain Confidential Offering Memorandum (the "Offering Memorandum") dated July 10, 2012, Company intends to offer for sale (the "Series A Offering") up to $12,000,000 of Series A Preferred Stock (the "Series A Preferred Stock") in Company at an offering price of $1.5154 per share. The Series A Offering may close in a singular or multiple closings (each such closing being a "Series A Closing") and the amount of shares of Series A Preferred Stock (and the price and terms of the Series A Preferred Stock) as set forth in the Offering Memorandum may change prior to the initial Series A Closing, as Company determines.  Employee may participate in the Series A Offering pursuant to the terms of the Offering Memorandum or subject to subsection (d)(ii) below.

(ii)      Initial Employee Stock Grant. Following the completion of the initial Series A Closing, in consideration for the services rendered by Employee to Company since the Effective Date pursuant to the Consulting Agreement, and for

continued services going forward, Company shall grant to Employee a number of shares of Common Stock equal to one percent of the number of shares of Common Stock outstanding on a fully diluted basis (the "Initial Employee Stock"). Notwithstanding anything in this Agreement or any other agreement of Company to the contrary, the Initial Employee Stock shall vest with Employee as follows: (i) one-half of the total amount as of the earlier of (A) the initial Series A Closing, or (B) January 15, 2013, and (ii) one-half of the total amount of the Initial Employee Stock on the first anniversary of the Effective Date.

    (iii)   Stock Option Grant. Employee shall be entitled to receive additional stock option grants equal to 85% of any such grants as are given to the chief executive officer during the Term pursuant to an equity incentive program to be adopted by the Company, as and when such grants are given, as determined by Company from to time. Grants to the current or any future chief executive officer in connection with hiring such person will not be taken into account for purposes of this subsection.

    (iv)   Employee Stock Purchase Program. In the event Company has or develops an Employee Stock Purchase Program, Employee shall be entitled to participate in the Employee Stock Purchase Program, if any, as in effect from time to time.

    (v)   Tax Matters. All shares and options shall be subject to tax withholding as required by law. Employee may make an election pursuant to Section 83(b) of the Internal Revenue Code with respect to the Initial Employee Stock if Employee so desires.

    (d)   Bonus. Employee shall be entitled to receive the following bonus(es):

    (i)   Annual Bonus. Employee shall be eligible to receive an annual cash bonus (an "Annual Bonus") pursuant to such incentive compensation program as Company may implement from time to time.

    (ii)   Other Compensation Rewards. In addition to the other compensation payable to Employee, Company and Employee may agree from time to time that Employee will be entitled to additional incentive payments resulting from certain other business or financial transactions between Company and third parties ("Compensation Rewards"). Employee will only be entitled to such payments to the extent they are set forth in a written agreement between Company and Employee that is executed prior to the consummation of any such transaction.

    (e)   Employee Benefits and Expenses.

    (i)   Leave. Employee shall be eligible to receive leave and similar benefits on the same terms as those provided to other employees of Company holding comparable positions, subject to such terms, including terms relating to eligibility and payment of employee contributions, as may be provided in the benefit plans.

    (ii)   Health Insurance. Employee shall be eligible to participate in Company's health insurance program on the same terms as those provided to other employees of Company holding comparable positions. In the event Employee does not

participate in the Company's health insurance program, Company shall pay Employee an amount equal to what the Company's employer contribution to that program would have been, as such amount is determined from year to year.

        (iii)   Expense Reimbursement. Employee shall be entitled to reimbursement of reasonable business expenses incurred in the course of his duties hereunder in accordance with Company's expense reimbursement policy in effect from time to time, and consistent with a budget established between Employee and Company for such expenses.

6.    Business Conduct.

In the performance of services hereunder, Employee agrees that he shall not discriminate against or harass anyone on the basis of race, religion, color, gender, age, disability, national origin or as otherwise prohibited by law. Employee shall comply with all applicable laws, regulations and codes of ethics with respect to his position in Company.

7.    Instructions; Authority.

Employee shall follow specific reasonable instructions from the chief executive officer or the Board of Directors relating to the performance of his job. Except for matters within the normal scope of his operational responsibilities, Employee shall have no authority to bind Company to any promise or representation unless authorized to do so in a particular transaction, in writing, by the chief executive officer or the Board of Directors.

8.    Confidentiality/Non-Disclosure Covenants of Employee and Noncircumvention.

(a) Confidentiality.

        (i)   Employee acknowledges that, during the course of employment with Company, Employee will have access to and become familiar with various confidential information and trade secrets including, but not limited to, those concerning Company's software, systems, plans, procedures, facilities, equipment, staff, fee and cost structures, customer lists, marketing plans, contacts, computer programs, compilations of information, client data, financial condition, and budgets, trends and strategic plans, which are all of a confidential and secret nature, are the sole and exclusive property of Company, and are of great value to Company. Employee agrees never to divulge to anyone or to make use of such information, either during or after the Term of this Agreement, unless directed to or given permission by an authorized representative of Company or to the extent required by law or court order. Employee agrees to deliver to Company upon demand and to make no further use of any and all papers, reports, programs, software, plans, documents, equipment of any nature provided to Employee by or in connection with Company or developed by Employee in the performance of services for Company. All files, records, documents, lists, specifications, equipment, papers and similar items prepared by Employee or otherwise coming into his possession, shall remain the exclusive property of Company, and shall not be removed from the premises of Company or photocopied in any manner under any circumstances whatsoever without the prior written consent of Company.

(ii)     Employee understands that, during the course of the Employee's work for Company confidential information may be divulged or may become known to Employee that is the result of others entrusting information to Company, and Employee agrees to treat such information in accordance with the confidentiality and non-use obligations as detailed above.

(iii)     Employee agrees that, in the course of performing services for Company, Employee will not breach any agreement or obligation Employee may have with another with respect to confidential information. Employee agrees not to bring to Company or use in Employee's work for Company any information, materials or documents obtained from others under an agreement of confidentiality.

(iv)     Information or data that has lawfully and without violation of a confidentiality obligation by Employee entered the public domain shall not be considered to be encompassed by the obligations in set forth in this Section 8.

(b) Noncircumvention.

(i)     Company, either directly or through its directors, officers, employees, shareholders, partners, members, brokers or affiliates (collectively, the "Company Parties"), may learn from Employee the names and telephone numbers of investors, borrowers, lenders, agents, brokers, banks, lending corporations, individuals and/or trusts, or buyers and sellers that Employee believes would be a potential investor, customer or other business relationship for Company (collectively, "Contact(s)"). If Company or any of the Company Parties has an existing relationship with any person or entity prior to being introduced to such person or entity by Employee, it shall not be a Contact for purposes of this Agreement. A list of the Contacts that have been introduced to the Company on or before the date of this Agreement is attached hereto as Exhibit A, which shall be amended from time to time as additional Contacts are introduced to Company by Employee.

(ii)     Company agrees that neither Company nor any Company Parties on Company's behalf, for the duration of this Agreement and for a period of five years thereafter, will contact, deal with, negotiate or participate in any transaction with any Contact without first reaching an agreement with Employee pursuant to Section 5(d)(ii) regarding compensation to Employee, unless Employee gives prior written permission. Notwithstanding the foregoing, once any Contact has engaged in a transaction with Company, the Contact will no longer be considered a "Contact" for purposes of this Section 8(b) and shall be removed from Exhibit A.

(iii)     Company agrees to advise members of its senior management that the names of the Contacts are confidential Company information subject to the terms of the Company's agreement with such employees and may not be used other than on behalf of the Company without the written consent of Company and otherwise on the same

terms set forth in this Section 8(b) prior to disclosing any Contacts to any of such Company Parties.

(iv)   Further, Company agrees to cause the following Company Parties to enter into direct non-circumvention agreements with Employee that such Company Parties agree not to disclose, reveal or make use of any information, nor to do business with any Contact other than on behalf of the Company without the written consent of Employee and otherwise on the same terms set forth in this Section 8(b): Kurt F. Buseck, C. Scott Hartz and Robert M. Mehalso.   Company shall not be responsible for a breach of any such agreement by any of those individuals unless such breach was done on behalf of or for the benefit of the Company.

(v)   In case of a breach of Company's obligations under this Section 8(b) (including the failure to advise members of its senior management that the names of the Contacts are confidential Company information as described above), Company agrees that Employee shall be entitled to such reasonable compensation as he would have earned based on the transaction done with the applicable Contact as a result of such breach had he and the Company entered into an agreement relating to such transaction.

(vi)   If either party commences legal proceedings to interpret or enforce the terms of this Section, the prevailing party will be entitled to recover court costs and reasonable attorney fees.

9.   Employee Works.

Employee agrees that all inventions, discoveries, developments, computer programs and reports that Employee makes, conceives or develops in the course of employment with Company, whether or not patentable or copyrightable (collectively, "Works"), shall become and remain the sole property of Company.   Employee will notify Company promptly and in writing of such Works.   Employee hereby transfers and assigns all right, title, copyright and interest in such Works to Company and will from time to time give Company all reasonable assistance, execute all papers and do all things that may reasonably be required to protect and preserve the rights of Company in such Works.   Contacts are not considered Works for purposes of this Agreement.

10.   Return of Property.

Employee agrees, upon the termination of this Agreement for any reason whatsoever, to return to an officer of Company all records, equipment, copies of records, documents, client and employee lists, files, drawings, manuals, programs, proposals, business cards, directories, specifications, papers and any documents concerning Company's customers or Company's products or processes, which Employee may have; and in the event Employee shall violate this Section 10, Employee shall forfeit all claims to unpaid compensation until such time

as any such violation has been cured without affecting the right of Company to compel the return of said records, equipment, copies of records, documents, lists, files, drawings, manuals, business cards, calendars, directories, specifications, paper and similar items.  In the event that Employee shall have purchased any of the above-referenced materials, he shall be reimbursed by Company upon presentation of an expense report, together with receipts.  Notwithstanding anything contained in this Section 10 to the contrary, in no event shall information related solely to Contacts of Employee (excluding any agreements or communications between Company and any Contact) be considered property of Company under this or any other section of this Agreement.

11.    Indemnification.

(a)    Indemnification by Company.  Company shall defend and indemnify Employee for acts performed by Employee in the course and scope of his employment hereunder, subject to limits, exclusions and other terms and conditions set forth in Company Policies; provided, however, that Company shall not defend or indemnify Employee for claims (i) against Employee by Company, (ii) arising from Unrelated Activities, (iii) from violations of laws or other acts outside the course and scope of his employment hereunder, or (iv) unauthorized or negligent acts, omissions or representations in the performance of services hereunder by Employee.

(b)    Indemnification by Employee.  Employee shall defend, indemnify and hold harmless Company, its affiliates and their respective officers, directors, shareholders, employees and agents from all actions, claims, damages, demands, losses, liabilities, costs and expenses, including attorneys' fees, arising from or related to:

(i)    Employee's Unrelated Activities;

(ii)    Acts outside the course and scope of the Employee's employment, including, but not limited to, violations of law, regulations, or Company Policies; or

(iii)    Unauthorized or negligent acts, omissions or representations in the performance of services hereunder by Employee.

Employee shall notify Company of any matter referred to in this Section 11, and Company shall have the right to select, direct and discharge any attorney which Employee or Company is required to provide under this Section 11.

12.    No Third Party Beneficiaries.

Nothing in this Agreement shall be construed to confer any rights to any third party to avoid the payment of any fees or commissions to Company or to limit the rights of Company in the payment of any such fees or commissions or to enforcement of any agreement with respect to third parties.

13.    Consequence of Termination of Employment or Change of Control.

(a)    Circumstances of Termination.

Company may terminate Employee's employment at any time during the Term for any of the following reasons: (i) for Cause; (ii) without Cause; (iii) for Employee's death; (iv) for Employee's Disability. The Agreement may also be terminated voluntarily by Employee for any or no reason, provided Employee gives Company two weeks prior notice of such voluntary termination. Company shall provide Employee with two weeks prior written notice of termination; provided, however, that Company shall have the right to restrict Employee's access to Company's properties and records during such period as it sees fit in its reasonable discretion provided Company pays Employee any compensation that is determined to be payable during such two-week period.

(b)    Definitions of "Cause" and "Disability".

For purposes of this Agreement only, Company shall have "Cause" to terminate Employee's employment hereunder only on the: (i) basis of fraud, misappropriation or embezzlement on the part of Employee; (ii) commission of (x) a felony or (y) any other crime that would result in harm to Company or its reputation; (iii) conducting a business prohibited by Company Policies in effect from time to time (provided however, that such Company Policies do not conflict with the terms of this Agreement); (iv) any violation of Sections 8 or 14 of this Agreement; (v) intentional misconduct, gross negligence, misrepresentation of property, material misrepresentation in the performance of Employee's duties hereunder or in Employee's dealings with Company; or (vi) any other material breach of this Agreement. "Disability" is defined as follows: If at the end of any month Employee then is, and has been, for six consecutive full calendar months then ending, or 80 or more of the normal working days during the 12 consecutive full calendar months then ending, unable to perform his material duties under this Agreement with reasonable continuity due to mental or physical illness or injury, Employee will be deemed to be suffering from a Disability.

(c)    Consequences of Termination.

(i)    Termination for Cause; Voluntary Termination by Employee.

If Employee is discharged by Company for Cause or Employee voluntarily terminates this Agreement pursuant to this Section 14, then Employee will thereafter be entitled to the following benefits:

(A)    Base Salary.  Employee shall be entitled to Base Salary earned under Section 5(b) but not yet paid.

(B)    Other Compensation.  Employee shall be entitled to any Annual Bonus and Compensation Rewards already earned through the date of termination.  Except as otherwise provided in any separate bonus agreement, Company shall pay any other bonuses payable to Employee with respect to transactions that occurred on

or before the date of termination. Any equity compensation that has not yet vested shall be forfeited.

(C)      <u>Employee Benefits</u>. Employee shall be entitled to such employee benefits as are required by law.

(ii)  <u>Termination by Reason of Death or Disability; Termination Without Cause</u>.

If Employee's employment terminates by reason of death, is terminated by Company for Disability or is terminated without Cause, then Employee, or his estate, as the case may be, will be entitled to the following benefits:

(A)      <u>Compensation</u>. Employee shall be entitled to Base Salary through the date of death or termination by reason of Disability, or otherwise through the end of the Term. Employee, or his estate, as the case may be, shall also be entitled to any Compensation Rewards due and owing Employee through the end of the Term;

(B)      <u>Other Compensation</u>. Employee shall be entitled to any Annual Bonus earned through the end of the Term. Except as otherwise provided in any separate bonus agreement, Company shall pay any other bonuses payable to Employee with respect to transactions that occur on or before the end of the Term. Any equity compensation (as set forth in Section 5(b) or otherwise) that has not yet vested shall become fully vested on the date of such termination.

(C)      <u>Employee Benefits</u>. If: (i) terminated by reason of death or Disability, Employee shall receive such benefits as are vested as of the date of termination by reason of death or Disability under Company's benefit plans in effect from time to time through the end of the Term; or (ii) otherwise upon a Termination without Cause, as required by law and for a period extending through the end of the Term.

(d) <u>Dispute Resolution for Compensation Rewards Following Termination of Employment</u>.

In the event a dispute arises between Employee and Company with respect to whether any Compensation Rewards are payable to Employee following termination of Employee's employment, Employee shall notify the chief executive officer of Company in a writing (the "<u>Dispute Notice</u>") of such dispute within 30 days after Employee obtains knowledge of the amount of the Compensation Rewards (if any), being paid by Company to Employee. The Dispute Notice shall identify the Compensation Rewards that are in dispute and shall describe in

reasonable detail the position of Employee with respect thereto. Upon the receipt of the Dispute Notice, Company shall within 10 days from receipt thereof respond in writing (the "Dispute Response") to Employee, describing in reasonable detail Company's position with respect to such dispute. In the event the Dispute Notice has been delivered in accordance with the provisions hereof, and Company does not provide the Dispute Response within such 10-day period, Company shall be deemed to dispute the allegations contained in the Dispute Notice and the parties shall enter the Dispute Resolution Period (defined below). If the parties have not been able to settle the dispute within 10 days of the delivery of the Dispute Response (the "Dispute Resolution Period"), such dispute shall be determined by arbitration in Pittsburgh, PA by a panel of three arbitrators. Each party shall select one arbitrator within 10 days following the expiration of the Dispute Resolution Period and the two arbitrators selected by the parties shall select a third arbitrator within 10 days of their appointment. If either party fails to select an arbitrator within such time period, the dispute will be determined by the arbitrator selected by the other party, provided that such arbitrator was selected within such 10-day period. The arbitrators shall make a determination regarding the dispute within 10 days of the appointment of the third arbitrator. The decision of the arbitrators shall be in writing and shall be final and binding on the parties. The parties hereby waive any rights to appeal or to review such arbitral decision or award by any court or tribunal. Any out-of-pocket costs and expenses incurred by either party in connection with the resolution of any dispute shall be borne by the party incurring the same; provided, however, that the arbitrators may determine that the prevailing party shall be entitled to reimbursement for, and the non-prevailing party shall be liable for, such costs and expenses incurred by the prevailing party in connection with the resolution of this dispute. If such determination is made, the non-prevailing party shall provide such reimbursement to the prevailing party within 20 days of the final determination provided by the arbitration panel.

(e) Change of Control.

If a Change of Control (defined below) occurs during the Term, Employee may, for a thirty (30) day period immediately following the date of the Change of Control, terminate his employment with Company. In the event of a termination by Employee following a Change of Control, Employee's Base Salary, Annual Bonus, Compensation Rewards and any equity compensation (as set forth in Section 5(b) or otherwise) shall be paid to (or be vested in) Employee in the manner set forth in Section 13(c)(ii) above through the date of termination and upon making such payments and providing such benefits, this Agreement shall become null and void and have no further force or effect on Employee or Company.

For purposes of this Section, a "Change of Control" shall mean:

(i) if prior to an initial public offering by Company, the sale of all or substantially all of the assets of Company, including any corporate transaction which results in the divestiture of a majority of the officers of Company (excluding Employee) or board of directors of Company; or

(ii) if after an initial public offering,

(1) any "person" (as defined in Section 13(d) and Section 14(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")), (excluding for this purpose (x) Company or any subsidiary of Company, or (y) any employee benefit plan of

- 11 -

Company or any subsidiary of Company, or any person or entity organized, appointed or established by Company for or pursuant to the terms of any such employee benefit plan which acquires beneficial ownership of voting securities of Company) is or becomes the "beneficial owner" (as defined in Rule 13d-3 under the exchange Act), directly or indirectly, of securities of Company representing more than 50% of the combined voting power of Company's then outstanding securities, provided, however, that no Change of Control will be deemed to have occurred as a result of a change in ownership percentage resulting solely from an acquisition of securities by Company; or

(2) during any two consecutive years, individuals who at the beginning of such two-year period constitute the board of directors and any new director (except for a director designated by a person who has entered into an agreement with Company to effect a transaction described elsewhere in this definition of Change of Control) whose election by the board of directors or nomination for election by Company's stockholders was approved by a vote of at least two-thirds of the directors then still in office who either were directors at the beginning of the period or whose election or nomination for election was previously so approved cease for any reason to constitute at least a majority of the board of directors of Company; or

(3) a reorganization, merger or consolidation or sale or other disposition of all or substantially all of the assets of Company (a "Business Combination"), in each case, unless, following such Business Combination, all or substantially all of the individuals and entities who were the beneficial owners of the outstanding voting securities of Company immediately prior to such Business Combination beneficially own, directly or indirectly, more than 50% of the combined voting power of the then outstanding voting securities entitled to vote generally in the election of directors, as the case may be, of Company resulting from such Business Combination (including, without limitation, a company which, as a result of such transaction, owns Company or all or substantially all of Company's assets either directly or through one or more subsidiaries) in substantially the same proportions as their ownership, immediately prior to such Business Combination, of the outstanding voting securities of Company; or

(4) approval by the stockholders of Company of a complete liquidation or dissolution of Company.

(iii) notwithstanding anything in this Section 13(e) to the contrary, the initial public offering of Company will not constitute a Change of Control.

14.   Restrictive Covenants.

During the term of Employee's employment with Company (or any of its affiliates) and for one year thereafter (the "Restricted Period"), Employee shall not, directly or indirectly, either as an employee, employer, consultant, agent, principal, partner, stockholder, corporate officer, director, or in any other individual or representative capacity, do any of the following:

(a) engage or participate in any business that is in direct competition with the Business of Company (or its affiliates) relating to the development and sale of computer and network security and cyber-security technology that is created to detect malicious activity rather than malicious code or any other technology that is developed by or on behalf of Company

during the Term of this Agreement. This restriction shall apply throughout the United States as well as anywhere else in the world where Company has customers during the term of Employee's employment. Employee acknowledges that Company's business is not geographically limited in scope and is highly competitive. Employee has the skills and background to obtain employment and provide a livelihood for himself in a business other than one in direct competition with Company in the event of the termination of employment with Company. It is the well-considered intent of the parties that this covenant not to compete is intended to protect Company from Employee competing directly with Company, but is not intended to restrict Employee from seeking employment with any company outside of this restriction; and

(b) (i) induce or attempt to induce any employee to quit employment with Company; (ii) interfere with or disrupt Company's relationship with other employees; or (iii) solicit or attempt to solicit (whether directly or indirectly though any entity owned in whole or in part by Employee) any employee or broker of Company or encourage any such person to terminate his or her employment with Company. This limitation shall apply to the employees of Company's successors, affiliates and subsidiaries as well; and

(c) (i) induce or attempt to induce any customer or supplier to terminate or modify its business relationship with Company; or (ii) interfere with or disrupt Company's relationship with any other person. This limitation shall apply to the customers and suppliers of Company's successors, affiliates and subsidiaries as well.

Employee agrees that, with respect to each prospective employer with which Employee applies or interviews for employment during Employee's employment with Company and within the Restricted Period, Employee will inform the prospective employer of the existence of this Agreement and will provide the prospective employer with a copy of this Agreement. Company reserves the right to notify Employee's prospective employers of this Agreement if, in Company's sole discretion and reasonable belief, a potential breach of the provisions of this Agreement may occur.

Employee acknowledges that Employee's services rendered and to be rendered hereunder are of a special and unique character, having great value to Company, the loss of which cannot be adequately compensated by damages. In the event that Employee violates this Section 14, Company shall be entitled (i) to injunctive relief (as described in Section 15(b)), (ii) to any expenses incurred in connection with the enforcement of the terms hereof, and (iii) to any other appropriate remedy that may be permitted at law or in equity.

15.    Severability of Provisions; Injunctive Relief.

(a)    In the event that any provision of this Agreement should be adjudicated by a court of competent jurisdiction in proceedings to which Company is a proper party to exceed the time or geographic or other limitations permitted by applicable law, then such provisions shall be deemed revised to the maximum time or geographic or other limitations permitted by applicable law, as determined by such court in such action, the parties hereby acknowledging their desire that in such event such action be taken. In addition to the above, all of the provisions of this Agreement are severable, and the invalidity or unenforceability of any provision or provisions of this Agreement or portions or aspects thereof will not affect the validity or enforceability of any other provision or portion of this Agreement, which will remain in full

force and effect as if executed with the unenforceable or invalid provision or portion or aspect thereof modified, as set forth above.

(b)    Employee acknowledges and agrees that (i) the provisions of Section 15 are reasonable and necessary to protect the legitimate interests of Company and its affiliates, and (ii) any violation of Section 15 will result in irreparable harm to Company, the exact amount of which will be difficult to ascertain, and that the remedies at law for any such violation would not be reasonable or adequate compensation to Company for such a violation. Accordingly, Employee agrees that if he violates the provisions of Section 15, in addition to any other remedy which may be available at law or in equity, Company shall be entitled to injunctive relief, without posting bond or other security, and without the necessity of proving actual damages.

16.    Modification and Waiver of Breach.

No waiver or modification of this Agreement shall be binding unless it is in writing, signed by the parties hereto. No waiver of a breach hereof shall be deemed to constitute a waiver of any further breach, whether of a similar or dissimilar nature.

17.    Assignment.

This Agreement may not be assigned by Company or Employee without the other party's prior written consent, provided, however, that Company may assign this Agreement to any parent or subsidiary of Company or other affiliate which now or hereafter is controlled, controlled by or under common control with Company or in connection with a sale or other transfer of all or a substantial portion of its Business.

18.    Notice.

All notices, requests, demands and other communications provided for herein, shall be in writing and shall be deemed to have been duly given when received if personally delivered or delivered by overnight courier service or mailed, as follows:

(a)    If to Company, addressed to:
Taasera, Inc.
Third Floor
1030 State Street
Erie, PA 16501

(b)    If to Employee, addressed to:
c/o Crane & Crane Consulting
1301 K Street, NW
Suite 600
Washington, DC 20005

or to such other address or attention of such other person as either party shall advise the other party in writing. All notices and other communications given pursuant to this Agreement shall be deemed to have been given on the date of receipt.

[014183651]    - 14 -

19.   Governing Law; Construction of Agreement.

This Agreement shall be governed by the laws of the Commonwealth of Pennsylvania without regard to any conflicts of laws provisions. This Agreement is the joint product of Employee and Company and each provision hereof has been subject to the mutual consultation, negotiation and agreement of Company and Employee, who was represented by counsel, and shall not be construed for or against any party hereto on the basis of any party that has acted as draftsperson.

20.   Entire Agreement.

This Agreement constitutes the entire understanding between the parties with respect to Employee's employment with Company during the Term, superseding all negotiations, prior discussions and preliminary agreements, written or oral, concerning said employment. This Agreement may not be amended except in writing by the parties hereto. If the Agreement is terminated or expires, the provisions contained herein regarding (i) non-competition, (ii) non-circumvention, (iii) no solicitation of business or employees, and (iv) confidentiality trade secrets and work product shall survive and shall continue to be in effect (subject to any time limits set forth in Sections 8 and 14, as applicable).

21.   Tax Consequences.

Employee shall be responsible for any federal, state or local taxes owed by Employee by reason of this Agreement, and payments hereunder may be reduced to the extent necessary to satisfy applicable federal, state and local withholding requirements. Employee agrees that Company has not rendered any advice to Employee concerning the tax consequences of this Agreement nor has Company promised or guaranteed any favorable or other specific tax treatment of amounts owed Employee under this Agreement.

22.   Arbitration; Waiver of Jury Trial.

(a)   Any dispute or controversy arising under, out of, in connection with or in relation to this Agreement may, at the election and upon written demand of either Employee or Company and the consent of the other, be finally determined and settled by arbitration before a panel of three arbitrators to be held in Pittsburgh, Pennsylvania in accordance with the rules and procedures of the American Arbitration Association, and judgment upon the award may be entered in any court having jurisdiction thereof. In such event, each party shall select one arbitrator and the two arbitrators selected by the parties shall select a third arbitrator. The decision of the arbitrators shall be in writing and shall be final and binding on the parties. The parties hereby waive any rights to appeal or to review such arbitral decision or award by any court or tribunal. Any out-of-pocket costs and expenses incurred by either party in connection with the resolution of any dispute shall be borne by the party incurring the same; provided, however, that in the event of an arbitration, the arbitrators may determine that the prevailing party shall be entitled to reimbursement for, and the non-prevailing party shall be liable for, such costs and expenses incurred by the prevailing party in connection with the resolution of this dispute. If such determination is made, the non-prevailing party shall provide such reimbursement to the prevailing party within 30 days of the final determination provided by the arbitration panel.

(b)    IN THE EVENT OF ANY LITIGATION BETWEEN EMPLOYEE AND COMPANY WITH RESPECT TO, CONNECTED WITH, OR ARISING OUT OF THIS AGREEMENT OR THE PARTIES' RELATIONSHIP AS EMPLOYER AND EMPLOYEE OR THE TERMINATION OF EMPLOYEE'S EMPLOYMENT, COMPANY AND EMPLOYEE EACH HEREBY WAIVES ITS/HIS RIGHT TO TRIAL BY JURY THEREIN.

23.    Counterparts.

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute one and the same instrument.  This Agreement may be executed by facsimile and all counterparts so executed shall be deemed originals.

IN WITNESS HEREOF, the parties hereto have executed this Agreement as of the date first written above.

TAASERA, INC.,
a Delaware corporation

By: _____
Name: _____
Title: _____

EMPLOYEE:

_____
Richard P. Stanton, individually

Exhibit A

as of December 19, 2012:

Mike Boland
John Boland
Lou Boland/Boland Trane Inc.

John Boland

Jim Boland

Mike Norton-Norton-Carrochio Restaurant Group-
John Carrochio

David Kane-Kane Companies
John Kane-same

Fernando Murias

Scott McIntyre

David Donohoe-Roth Capital Advisors

Stuart Plank,

Kevin Plank,

Scott Plank

Under Armour

Ed Brady--Brady Homes-
Federal Home Loan Bank of Chicago

Mark Purcell

NAHB

John Thompson-Thompson Builders-
Matt Thompson-same-
Eric Wolff

Charles Mellody

Joe O'neill

Galapagos Partners Private Equity (Oneill)

Mark Green/Zenetek LLC

Gene Vukelic/Try-It Budweiser Distributors/InBev/Budweiser Inc.

Robert Blatt

Bill Fugazy

(014)8365)

Mountaineer Gaming Inc

Bud Hawk/Cornerstone Capital

Jim Gorgei/Novetta Solutions

Betsy Gorgei/Edge Technologies

Dominic Visconsi/Visconsi Companies

Fred Rzepka/Transcon Inc.

First Energy Inc.

Bank of Georgetown

Charles Hanley/ProActive Intelligence

Charles Matthews/EIS

Pat Caulfield/EIS

Danny Hanley

Gene Fullano

Brett Larkin/Cleveland Plain Dealer

Mary Jordan/Washington Post

Jim Pasco/National Fraternal Order of Police

Motion Picture Association of America

MacAndrews and Forbes Holdings Inc.

U.S. House of Representatives CAO Dan Strodel

Congressional Federal Credit Union

Telos Inc

Mike Flaherty

John Caulfield

US House of Representatives Sergeant at Arms/CIO Jim Kaelin

Senate Sergeant at Arms

Blackboard Inc

Michael Stanton

James Stanton

Joseph Stanton

Paul Sheridan

Salomon Melgen

Mike Baker

Arch Stokes

Jaime Gonzalez

Jose Gonzalez

Frank Bishop

Ed Fox

Richard Goodwin

CACI

Rick Dansey

Steve Peck

Larry Thompson

(b)    IN THE EVENT OF ANY LITIGATION BETWEEN EMPLOYEE AND COMPANY WITH RESPECT TO, CONNECTED WITH, OR ARISING OUT OF THIS AGREEMENT OR THE PARTIES' RELATIONSHIP AS EMPLOYER AND EMPLOYEE OR THE TERMINATION OF EMPLOYEE'S EMPLOYMENT, COMPANY AND EMPLOYEE EACH HEREBY WAIVES ITS/HIS RIGHT TO TRIAL BY JURY THEREIN.

23.    Counterparts.

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute one and the same instrument. This Agreement may be executed by facsimile and all counterparts so executed shall be deemed originals.

IN WITNESS HEREOF, the parties hereto have executed this Agreement as of the date first written above.

TAASERA, INC.,
a Delaware corporation

By: _____
Name: _____Kurt Bugeck_____
Title: _____CFO_____

EMPLOYEE:

_____
Richard P. Stanton, individually